

ENTERED
05/13/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| NANCY SHEALY HOLDAWAY | § | CASE NO: 07-32597 |
| Debtor(s) | § | |
| | § | CHAPTER 7 |
| | § | |
| BETTY WINN | § | |
| Winn(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 07-3321 |
| | § | |
| NANCY SHEALY HOLDAWAY | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION ON FINAL JUDGMENT

For the reasons set forth below, the Court finds in favor of Plaintiff, Ms. Betty Winn. The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Background

On April 17, 2007, Nancy Shealy Holdaway ("Holdaway") filed for Chapter 7 bankruptcy relief. On July 5, 2007, a complaint was filed against Holdaway, by her mother, Betty R. Winn ("Winn") seeking a judgment of non-dischargeability of certain debts pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). Holdaway's 82-year old mother, Winn, asserted that Holdaway had stolen and mismanaged Winn's assets that had been entrusted to Holdaway's care.

On December 13, 2007, Winn filed a notice of removal, removing to this Court a state court action filed July 7, 2006, in Harris County against Holdaway and a former husband of Holdaway's, Paul Buchanan. The state court suit asserted claims for breach of fiduciary duty and duty of good faith and fair dealing, conversion, negligence, gross negligence, securities law

violations, fraud, breach of contract, alleged Holdaway was an Executor De Son Tort and requested an accounting.  Holdaway moved to remand the state court suit.

On January 15, 2008, the Court signed an agreed order granting the motion for remand. The order remanded only the state law causes of action.  The Court retained the § 523(a) claims. Winn filed a First Amended Complaint on February 18, 2008.  She maintained her claims under §§ 523(a)(2)(A) and 523(a)(4).  Trial of this adversary proceeding commenced on April 7, 2008. Holdaway asserted that the statute of limitations had expired on Winn's causes of action.  For the reasons set forth below, the Court finds in favor of Winn on the § 523(a)(4) cause of action.  The Court finds in favor of Holdaway on the § 523(a)(2)(A) claim.

### 11 U.S.C. § 523(a)(2)(A)

The discharge in bankruptcy is to protect the "honest but unfortunate debtor" and to give the debtor a fresh start.  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).   There are several debts, however, that for public policy reasons are excepted from discharge.  These are debts generally incurred due to malfeasant activity.  *See Cohen v. de la Cruz.*, 523 U.S. 213, 222 (1998). Congress codified this principle in 11 U.S.C. § 523(a).  *Id.* (quoting *Grogan*, 498 U.S. at 287) ("The various exceptions to discharge in § 523(a) reflect a conclusion on the part of Congress 'that the creditors' interest in recovering full payment of debts in these categories outweight[s] the debtors' interests in a complete fresh start.'").

Section 523(a)(2)(A) excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).

In defining the elements to be fulfilled under § 523(a)(2)(A), the Fifth Circuit has "distinguished between actual fraud on the one hand and false pretenses and  representations on

the other." *RecoverEdge L.P. v. Penetecost,* 44 F.3d 1284, 1292 (5th Cir. 1995). The elements

for each are "different but somewhat overlapping." *In re Mercer,* 246 F.3d 391, 404 (5th Cir.

2001). Specifically, a false representation or pretense requires a knowing and fraudulent

falsehood that describes past or current facts and is relied upon by the other party. *See*

*RecoverEdge*, 44 F.3d at 1292; *In re Allison,* 960 F.2d 481, 483 (5th Cir. 1992); *In re Bercier,*

934 F.2d 689, 692 (5th Cir. 1991). For a past or current fact, the Fifth Circuit has held that "a

promise to perform acts in the future is not considered a qualifying misrepresentation merely

because the promise subsequently is breached." *In re Allison*, 960 F.2d 481, 484 (5th Cir. 1992)

(citing *In re Bercier,* 934 F.2d 689 (5th Cir.1991)). However, a debtor's misrepresentations of

his intentions "may constitute a false representation within the meaning of the dischargeability

provision if, when the representation is made, the debtor has no intention of performing as

promised." *In re Allison*, 960 F.2d at 484. In contrast, for the purposes of nondischargeability,

actual fraud requires a creditor to prove that "(1) the debtor made representations; (2) at the time

they were made the debtor knew they were false; (3) the debtor made the representation with the

intention and purpose to deceive the creditor; (4) the creditor relied on such representations; and

(5) the creditor sustained losses as a proximate result of the representations." *RecoverEdge,* 44

F.3d at 1293 (quoting *In re Roeder,* 61 B.R. 179, 181 (Bankr. W.D. Ky. 1986)).

After Winn's case-in-chief, Holdaway moved for a judgment as a matter of law under

Federal Rule of Civil Procedure 50.[1] The Court denied Holdaway's request as to the § 523(a)(4)

---

[1] Rule 50 applies in jury trials. This proceeding was not a jury trial. However Rule 52 provides for similar relief in actions tried without a jury. Rule 52 is incorporated into bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7052. Rule 7052 provides:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a finding on that issue…

claim, but granted Holdaway's request as to the § 523(a)(2)(A) claim.  Section 523(a)(2)(A) requires that the debt subject to the dischargeabiltiy suit is "for money, property, [or] services… *to the extent obtained, by*—(A) false pretenses, a false representations, or actual fraud…"  11 U.S.C.  § 523(a)(2)(A) (emphasis added).

At trial, testimony was solicited from Winn, Holdaway, and Andrew Holdaway.  Andrew Holdaway is Holdaway's current husband; however, they are seeking a divorce.  The Court also heard deposition testimony from Paul Buchanan, a former husband of Holdaway's, who was married to Holdaway during the time period over which this trial concerns.

When Winn's husband passed away in July 1993, Winn asked either Holdaway or Paul Buchanan to manage her finances.  Winn's testimony and Paul Buchanan's deposition testimony was that Holdaway was to manage the finances.  Holdaway, however, testified that Paul Buchanan was to manage Winn's finances.  Regardless of who was to manage Winn's accounts, all parties agree Winn voluntarily relinquished the handling of her finances.

There were two accounts set up by Holdaway on behalf of Winn, an E-Trade Account and a Merrill Lynch Account.  Both of these accounts were funded entirely with Winn's funds, but set up in the names of Winn and Holdaway as joint tenants with rights of survivorship.

Winn presented into evidence checks totaling approximately $167,000.00 written from the E-Trade account.  These checks appeared on E-Trade statements issued in 1999.  Winn's signature appears on only one check for $1,478.90.  The remainder of the checks were signed by Holdaway.  Winn testified that while she knew of the existence of this account, she never received monthly account statements.  Holdaway testified that Holdaway had always been the

---

FED. R. CIV. P. 52(c)

party to receive the statements pursuant to Winn's request.  The Court finds that Winn trusted Holdaway and felt no need to monitor the account.

The Merrill Lynch account likewise demonstrates Winn's trust in Holdaway.  Holdaway had a separate account with Merrill Lynch in addition to Winn's account.  Holdaway stated that she had approximately eight or nine meetings a Merrill Lynch account representative to discuss these two accounts.   Winn was not involved in any of these meetings.

At some point prior to August 2001, Holdaway learned that there had been a significant drop in the balance of Winn's account.  Holdaway stated that she had informed the Merrill Lynch representative that if Winn's account dropped below $80,000, the account was to be cashed out.  Merrill Lynch allegedly allowed the account to drop significantly below this amount.  Holdaway informed Winn of this in August 2001 and informed Winn that the only recourse was to sue.  Holdaway testified that Winn told her to do whatever she thought was best.  A suit was brought against Merrill Lynch on June 3, 2002.  At trial, it was clear that Winn did not know the basis of that suit.  Furthermore, in preparing for the Merrill Lynch suit, Holdaway sent a letter to her attorney stating that "I have been the custodian of my mother's account since my dad died 8 years ago."  Clearly, Winn entrusted her Merrill Lynch account to Holdaway.

Winn further testified that Holdaway would send her documents to sign.  Winn stated she never questioned Holdaway when she signed these documents.  For example, a letter from Holdaway to Winn was admitted into evidence in which Holdaway instructs Winn to write two checks for $45,000.00 and $85,000.00 to set up an investment account.  The letter contains detailed instructions as to what forms to sign and how to deliver the checks.

In addition to handling Winn's investments, Winn testified that Holdaway handled new car purchases for Winn and the selling of Winn's home.  This was supported by the testimony of

Andrew Holdaway.  He testified that Winn asked Holdaway and himself whether she should sell her house.  He also testified that he and Holdaway purchased Winn a used car.

It is clear that Holdaway did not make any misrepresentations to *obtain* Winn's money or property.  Winn relinquished her property into Holdaway's control.  Any malfeasant activity which may have occurred arose after the time the property was transferred.  The Court, therefore, finds for Holdaway on the § 523(a)(2)(A) claim.

### *11 U.S.C. § 523(a)(4): Fraud in a Fiduciary Capacity*

Section 523(a)(4) applies to debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  In examining the standard for a claim under § 523(a)(4), the phrase "while acting in a fiduciary capacity" does not qualify the word embezzlement.  4 RESNICK & SOMMER COLLIER ON BANKRUPTCY ¶ 523.10[1][d] (15th ed. 2005) ("The phrase 'while acting in a fiduciary capacity' clearly qualifies the words 'fraud or defalcation' and not 'embezzlement' or 'larceny'").  In her complaint, Winn alleges that Holdaway was a fiduciary and that the "theft" of Winn's assets constitutes a fraud. The Court finds the complaint requests relief under both a fraud and an embezzlement theory.

The definition of "fiduciary" under § 523(a)(4) is "controlled by federal common law rather than Texas law."  *Miller v. J.D. Abrams Inc. (In re Miller)*,156 F.3d 598,  602 (5th Cir. 1998).  Under § 523(a)(4) "a fiduciary is limited to instances involving express or technical trusts."  *Id.* (quoting *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998)).  A constructive trust is not sufficient to create a fiduciary relationship.  *See Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1339 (5th Cir. 1980).  The trustee's duties must "arise independent of any contractual obligation".  *In re Tran*, 151 F.3d at 342 (citing *Angelle*, 610 F.2d at 1339).  The trustee's obligations "must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong."  *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S.

6

328, 333 (1934)); *Angelle*, 610 F.2d at 1339 (A technical trust must "exist prior to the act creating the debt and without reference to that act.").  However, the Fifth Circuit recognizes that the "'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law."  *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 784-85 (5th Cir. 1993) (citing *Moreno v. Ashworth*, 892 F.2d 417, 421 (5th Cir. 1990)).

State law,[2] therefore, "is important in determining whether or not a trust obligation exists." *Gupta v. E. Idaho Tumor Inst. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004) (quoting *LSP Inv. P'ship*, 989 F.2d at 784).  "The state may impose trust-like obligations on those entering into certain kinds of contracts, and these obligations may make a contracting party a trustee." *In re Angelle*, 610 F.2d at 1341.

The Texas Property Code defines an express trust as follows:

"Express trust" means a fiduciary relationship with respect to property which arises as a manifestation by the settlor of an intention to create the relationship

---

[2] The actions leading to this proceeding occurred in Georgia.  Winn filed the original pre-bankruptcy suit in the 333rd District Court of Harris County, Texas.  In Winn's complaint, Winn asserted claims under the Texas Securities Act, under federal securities law, and asserted that Winn was an executor son tort under Georgia Law.  Winn sought remedies under the Texas Civil Practice and Remedies Code for attorney fees.  Holdaway filed an answer in state court to Winn's complaint specifically excepting to a Texas court applying a Georgia statute.  In the Complaint filed in this proceeding to determine the dischargeability of debt, Winn asserts that the Complaint filed in Harris County, Texas, asserted causes of actions under "the Texas Securities Act, violations of the Securities Exchange Act of 1934, as amended, violations of federal securities laws and other common law causes of action…" Federal choice of law rules require the application of the choice of law rules of the forum state.  *Canton v. Leach Corp.*, 896 F.2d 939, 932 (5th Cir. 1990) (citing *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975)).  Under Texas choice of law rules, there is a presumption that another state's law is the same as Texas.  12 TEX. JUR. 3d *Conflict of Laws* § 9 (2008) (citing *Excess Underwriters at Lloyd's v. Frank's Casing Crew & Rental Tools, Inc.*, 93 S.W.3d 178 (Tex. App. Houston [14th Dist.] 2002), *aff'd*, 246 S.W.3d 42 (Tex. 2008)).  "[A]bsent the proper invocation of foreign law by pleading and proof, Texas courts must presume the foreign law to be the same as that of Texas." *Pellow v. Cade*, 990 S.W.2d 307, 312-13 (Tex. App.-Texarkana 1999, reh'g overruled) (citing *Country Cupboard, Inc. v. Texstar Corp.*, 570 S.W.2d 70, 72 (Tex. Civ. App.-Dallas 1978, writ ref'd n.r.e.)).  Based on Winn's assertions in the Complaint to determine dischargeability of debt as to the application of Texas law, the Court finds that Winn has not invoked foreign law in a manner which would support an application of Georgia law.  Furthermore, in the state court litigation, Holdaway raised a choice of law argument excepting to Georgia law.  In this proceeding, Holdaway has not raised any choice of law argument to the contrary.  The Court, therefore, considers any such argument waived.  The Court will apply the law of the forum state, Texas.  *See Padrino Maritime, Inc. v. Rizo*, 130 S.W. 3d 243, 249 (Tex. App.—Corpus Christi 2004, no pet.).

and which subjects the person holding title to the property to equitable duties to deal with the property for the benefit of another person.

TEX. PROP. CODE § 111.004(4) (Vernon's 2008).[3]  "A party seeking to establish an express trust must show the existence of the intended trust property, object, and beneficiary with reasonable certainty."  *In re Estate of Berger*, 174 S.W.2d 845, 848 (Tex. App.-Waco 2004, no pet.) (citing *Hubbard v. Shankle*, 138 S.W.3d 474, 483-84 (Tex.App.-Forth Worth 2004, pet. denied)).  "A trust is created only if the settler manifests an intention to create a trust."  *Id.* (citing TEX. PROP. CODE § 112.002 (Vernon 1995)).

In Texas, a fiduciary is a "person owing a duty of integrity and fidelity... apply[ing] to any person who occupies a position of peculiar confidence towards another."  *Lee v. Hasson*, --- S.W.3d ---, 2007 WL 236899 at *8 (Tex. App.-Houston [14 Dist.] 2007, rev. denied) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942)).  An informal fiduciary duty "may arise from a moral social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship."  *Associated Indem. Corp v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998) (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).  Judge Guzman in *Hasson* explained this duty in Texas as follows:

> An informal fiduciary relationship exists "where, because of family relationship or otherwise, [one party] is in fact accustomed to be guided by the judgment or advice" of the other. *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962). "Such informal fiduciary relationships have also been termed 'confidential relationships' and may arise 'where one person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one.'" *Crim Truck & Tractor Co.,* 823 S.W.2d at 594 (quoting *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951)). Stated another way, a party fails to comply with his fiduciary duty "where influence has been acquired and abused, and confidence has been reposed and betrayed." *Hoggett v. Brown,* 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, pet. denied) (citing *Crim Truck & Tractor Co.,* 823 S.W.2d at 594).

---

[3] Under the Property Code, a "'trust' is an express trust only if it does not include: (1) a resulting trust; (2) a constructive trust; (3) a business trust; or (4) a security instrument..." TEX. PROP CODE § 111.003.

> "In order to give full force to contracts, we do not create such a relationship lightly." *Schlumber Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). As we have previously stated, [a] person is justified in placing confidence in the belief that another party will act in his or her best interest only where he or she is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, as well as personal friendship. *Hoggett,* 971 S.W.2d at 488. "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." *Thigpen,* 363 S.W.2d at 253. Where the evidence is disputed, the existence of an informal, confidential relationship is a question of fact. *See Crim Truck & Tractor Co.,* 823 S.W.2d at 594.

*Hasson*, 2007 WL 236899 at *8-9 (block quotes omitted).  Therefore, for Winn to maintain a cause of action under § 523(a)(4) for breaching a fiduciary duty, she must prove: (1) a fiduciary relationship exists between Holdaway and Winn; and (2) an express trust otherwise existed.

Pursuant to the detailed facts set forth above, the Court finds that there is no question that Winn was "guided by the advice of [Holdaway]" and believed Holdaway would act in her best interest.  *Hoggett*, 971 S.W.2d at 488.  Winn did not question Holdaway's directives and believed Holdaway was making decisions to sustain Winn financially in the future.  Accordingly, the Court finds that pursuant to Texas state law, Holdaway was Winn's fiduciary.

As for the existence of an express trust, however, in Texas, a trust in either real or personal property is generally enforceable "only if there is written evidence of the trust's terms bearing the signature of the settlor or the settlor's authorized agent."   TEX. PROP. CODE ANN. § 112.004 (Vernon 2008).  A caveat exists for trusts consisting of personal property.  Such a trust "is enforceable if created by":

> (1) a transfer of the trust property to a trustee who is neither settlor nor beneficiary if the transferor expresses simultaneously with or prior to the transfer the intention to create a trust; or

> (2) a declaration in writing by the owner of property that the owner holds the property as trustee for another person or for the owner and another person as a beneficiary.

*Id.* While this section deals with the enforceability of a trust rather than the creation or existence of a trust, the Court concludes that based on the narrow definition of a "fiduciary" within § 523(a)(4) and the specific exclusion of constructive and resulting trusts from falling therein, an express trust that is not enforceable would not fall under debts excepted from discharge pursuant to § 523(a)(4). This section also demonstrates that an express trust may be created without the existence of a written document. *See Cadle Co. v. Millican*, 1998 WL 267949, *4, fn5 (N.D. Tex. May 15, 1998) ("The fact that a transfer, sans written document, is capable of creating an express trust finds support in the statute of frauds provision of the Trust Code…").

In facts similar to this case, Judge Ross of the Texas Court of Appeals held that to qualify as a "transfer of the trust property", as stated in § 112.004(1), "the transfer must divest the trustor of all dominion and control over the trust *res.*" *Ayers v. Mitchell*, 167 S.W.3d 924, 930 (Tex. App.-Texarkana 2005). In *Ayers*, debtor/father instructed his daughter to take charge of his and his wife's funds to provide for their future healthcare. *Id.* at 929. The daughter transferred the funds into her account without the parents' knowledge. *Id.* at 930. The Court found that despite the fact that the parents informed a family member that they had completely divested control of these funds, the funds were not transferred within the meaning of § 112.004(1) to the daughter because the parents remained signatories on the initial account where the funds were held. *Id.* at 929 - 30. Accordingly, the Court concluded a trust was not created. *Id.*

In *Millican*, Judge Solis of the Northern District of Texas found that an express trust had been created where the settlor, Roy Millican, and the named trustees purported to execute two documents to create trusts. *Millican*, 1998 WL 267949 at * 1. The documents contained the name of the settlor, the trustee and that the property on "Schedule A" would be held in trust. *Id.* Schedule A, however, was blank. *Id.* In the following weeks, the settler delivered funds for deposit into the "Murry B. Millican Irrevocable Trust bank account" and the "Kenneth B.

10

Millican Irrevocable Trust bank account." *Id.* The settlor never again exercised control over the funds. *Id.* The Court found that an express trust was not created at the time the documents were executed but was created at the time the funds were delivered. *Id.* at *4. Citing the methods of creating a trust as found in the Texas Property Code, the Court noted that "[t]here is nothing in the Trust Code or common law prohibiting the creation of an express trust by inter vivos transfer by persons who have in the past failed to do so by written document (or any other method)." *Id.* at *4, fn 4 (citing TEX. PROP CODE § 112.001(2) (providing that an express trust may be created by "a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person."). "An express trust arises either by the express agreement or **by the direct and positive acts of the parties** or by some writing…" *Id.* (citing *Miller v. Donald*, 235 S.W. 2d 201, 205 (Tex. Civ.App.-Fort Worth 1950, writ ref'd n.r.e.) (emphasis in *Millican*)). The Court was clear, however, that to create a trust, the creating party must designate the property and make the transfer. *Id.* (citing RESTATEMENT (SECOND) OF THE LAW, TRUSTS, § 26, cmt. i (1959)).

The law is unambiguous that for an express trust to be valid, property must be transferred to a trustee. Indeed, as one court has stated, "[t]he law is well-settled that in a valid trust legal title to the trust res is vested in the trustee and the beneficiary has the equitable title only, without possession or right of possession. *Kuhns v. Carnes*, 1999 WL 699809, * 8 (Tex. App.-Austin 1999, pet. denied) (citing *Ex parte Rodriguez*, 636 S.W.2d 844, 847-48 (Tex. App.—San Antonio 1981, no writ)). In this proceeding, there was no creation of a trust. Although Winn manifested an intent for Holdaway to manage her funds, Winn never relinquished legal title. Indeed, Winn was listed as a signatory on the accounts with powers to withdraw funds freely.

An express trust was never created. Accordingly, although a fiduciary relationship exists under Texas law, this fiduciary relationship is insufficient to sustain a claim under § 523(a)(4)

11

for a breach of a fiduciary duty.  *See e.g. In re Angelle*, 610 F.2d at 1341.  (Fifth Circuit finding that the district court erred in finding the existence of a fiduciary relationship to satisfy § 523(a)(4) by improperly applying the "too broad" definition of "a relationship involving confidence, trust, and good faith").

### 11 U.S.C. § 523(a)(4): Embezzlement

Embezzlement for purposes of § 523(a)(4), however, is not limited to instances where a fiduciary duty exists.  *E.g.* 4 RESNICK & SOMMER COLLIER ON BANKRUPTCY ¶ 523.10[1][d] (15th ed. 2005) ("The phrase 'while acting in a fiduciary capacity' clearly qualifies the words 'fraud or defalcation' and not 'embezzlement' or 'larceny'").  Embezzlement is defined by federal law. *Rainey v. Davenport (In re Davenport)*, 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006) (citing *In re Hayden*, 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000)).  Under federal law, embezzlement is a "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).  To constitute embezzlement, the fraudulent appropriation must be "of another's property."  *In re Davenport*, 353 B.R. at 199; *See e.g. In re Dobek*, 278 B.R. 496, 509 (Bankr. N.D. Ill. 2002) (quoting *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) ("To prove embezzlement, Plaintiff must show that debtor appropriated the funds for her own benefit, and that it did so with fraudulent intent.")).

"To 'appropriate' is to exercise control over or to take possession of property."  *In re Davenport*, 353 B.R. at 200 (citing *Hayden*, 248 B.R. at 525).  Fraudulent intent is "an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property."  *Id.*  (citing *First Nat'l Bank of Midlothian v. Harrell (In re Harrell)*, 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988)).  "Fraudulent intent may be inferred from the conduct

of the Debtor and from circumstances of the situation."  *In re Harrell*, 94 B.R. 86, 91 (Bankr.

W.D. Tex. 1988) (citing *United States v. Powell*, 413 F.2d 1037 (4th Cir. 1969)).

"The burden of proof in an adversary proceeding under 11 U.S.C. § 523 is on the creditor

who seeks to show that his debt is not to be discharged."  *In re Harrell*, 94 B.R. 86, 90 (Bankr.

W.D. Tex. 1988) (citing *Hill v. Smith*, 260 U.S. 592 (1923)).  The creditor must prove his case by

a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 287 (1990).

At trial, Winn presented several checks written on Winn's account, signed by Holdaway,

but of which Winn had no knowledge.  Specifically, the following five checks were written on

the E-Trade account in 1998 or 1999: (1) $50,000 to Datek Online with the memo field stating

"new stock trading account"; (2) $50,000 to Paul Buchanan and Nancy Winn; (3) $20,000 check

to cash (4) $2,500 check to Paul Buchanan; and (5) $25,000 check to Paul Buchanan.

When questioned about these checks, Holdaway testified that she could not recall the

purposes of any of these checks except that the $2,500 check and $20,000 may have been to

reimburse Paul Buchanan for expenses related to investing.  Other than reciting the notes in the

memo lines on the checks, Holdaway had no explanation of how this money was used.

Holdaway testified that the E-Trade statements were mailed to Holdaway, except for a

brief time when Holdaway lived with Winn and the statements were mailed to Winn's address.

Holdaway, however, stated she reviewed the statements with Winn.

The Court does not believe Holdaway's testimony.  As a witness, she completely lacked

credibility.  During the course of testimony, the Court became aware of at least three separate

lies told by Holdaway: (1) Holdaway lied at her deposition about the number of marriages she

had been in;[4] (2) When Holdaway married Paul Buchanan, they had the marriage annulled[5] after

---

[4] Holdaway claimed that she lied because her current husband was in the room and she did not want him to find out about her first husband through a deposition.

two months, yet continued to live together as husband and wife in an effort to avoid Holdaway's

assets becoming obtainable by the IRS for a tax debt of Paul Buchanan's; and (3) Holdaway lied

in a letter to her lawyer[6] in the Merrill Lynch litigation about who was handling Winn's funds.[7]

Her excuses for these lies essentially were that at the time the lies were told, it was simply

convenient to lie.

---

[5] Holdaway was questioned at the hearing as to the reason why she had her marriage annulled. Based on Holdaway's testimony, the annulment was obviously fraudulently obtained for the sole purpose of avoiding her obligation to the United States.

| Mr. Hroch: | Isn't it true the reason why you had your marriage annulled with Mr. Buchanan was to basically avoid having to pay any taxes that Mr. Buchanan could be on the hook for? |
| Holdaway: | I was not a part of the IRS issues he had before our marriage, when the IRS agent said, now that you are married, we are gonna, you know, bring her into this and now that you got money, we gonna take it away, he went and had the marriage annulled, yes. |
| Mr. Hroch: | So the federal government informed you and your husband that you were going to be on the hook for his tax liability and the two of you conjured up a scheme to get the marriage annulled, but still live together as husband and wife, do I have that correct? |
| Holdaway: | We still lived together as husband and wife, yes; |
| Mr. Hroch: | And you continued to live as husband and wife, you just didn't tell the federal government that, correct? |
| Holdaway: | no (although Holdaway replied "no" to this question, the Court interprets this answer as, no, Holdaway did not inform the federal government that she and Mr. Buchanan lived together as husband and wife). |

FTR Log Notes Recording: Winn et al v. Holdaway et al (Apr. 8, 2008)

[6] This letter states "I have been the custodian of my mother's account since my dad died 8 years ago." In this litigation Holdaway has repeatedly asserted that Paul Buchanan was custodian of Winn's accounts. If the statement in the letter is the truth, then Holdaway is currently lying to this Court. Holdaway asserted she made this statement in the letter because it was easier than going into the details about her marriage to Paul Buchanan and Paul Buchanan managing the accounts.

[7] There is at least one additional inconsistent statement made by Holdaway as to the contents of Winn's estate. In the letter to Holdaway's attorney in 1996, during the Merrill Lynch litigation, Holdaway states that Winn's "entire estate consisted of a paid for home." However, in a letter to Winn, written in 2001, Holdaway references $130,000 in checks from a Charles Schwab account that would have been part of Winn's estate. At trial, Holdaway testified that this $130,000 was, at the time the letter to her attorney was written, a part of Winn's estate, but she did not include it in the letter because she considered that the bulk of her mother's estate was the home and "her memory was failing her." There is also evidence of proceeds of approximately $47,000 from a life insurance policy from 1993.

14

Winn produced $147,500 in checks drawn on Winn's E-Trade account, signed by Holdaway.  It is not disputed that the funds in the account were Winn's property and that Winn lawfully relinquished control of these funds to Holdaway.  Accordingly, pursuant to Holdaway's lack of accountability for how these funds were used and Winn's lack of knowledge that these checks were written, the Court finds that Holdaway exercised control over these funds for her own benefit.  Furthermore, the Court finds, based on the circumstantial evidence, the use of the funds was with fraudulent intent.  The Court finds Holdaway's usage of these funds from the E-Trade account constitutes embezzlement.

The Court finds that Winn, however, did not meet her burden in showing that the funds in the Merrill Lynch account were fraudulently appropriated.  The evidence showed no more than that the loss of funds was due to market conditions and/or the alleged mishandling of the funds by an agent of Merrill Lynch.

### Statute of Limitations Defense

In Holdaway's amended answer, Holdaway asserts that Winn's claims are barred by the applicable statute of limitations.  Generally, the limitations period begins to run, "from the time the wrongful conduct occurs…"  *Haidar v. Nortex Foundation Designs, Inc.*, 239 S.W.3d 924, 926 (Tex. App.—Dallas 2007, no pet.) (citing *Clade v. Larsen*, 838 S.W.2d 277, 282 (Tex. App.—Dallas 1992, writ denied)).  However, in certain cases the discovery rule applies.  "In cases where the discovery rule applies, the accrual of a cause of action may be deferred until the plaintiff knew or, by exercising reasonable diligence, should have known of the facts giving rise to the cause of action."  *Id.* (citing *Barker v. Echman*, 213 S.W.3d 306, 311-12 (Tex. 2006)).  For the discovery rule to apply, "the nature of the injury must be inherently undiscoverable and the injury itself must be objectively verifiable."  *Barker*, 213 S.W.3d 306, 312 (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998)).  The discovery rule applies "in cases

of fraud and fraudulent concealment, and in other cases in which 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.'" *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (quoting *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex.1996)).  The discovery rule applies in this proceeding.

Winn testified that since the time she first relinquished control of her funds to Holdaway, she had not considered her financial situation until a family meeting held on or near July 15, 2002.  This family meeting was initiated by the husband of another one of Winn's daughters.  At this meeting, Holdaway informed Winn that Winn had approximately twenty thousand dollars remaining in her accounts.  Winn described her mental state at this time as "shocked".

Holdaway testified that her relationship with Winn since this meeting has been "strained."  This strained nature, Holdaway asserted, is due to the accusations made at the meeting that Holdaway had stolen or misappropriated Winn's funds.  Holdaway presented two notarized documents dated July 15, 2002, where Holdaway removes herself from two of Winn's bank accounts.

Accordingly, the Court determines that July 15, 2002, is the date at which Winn knew of the facts giving rise to this complaint.  The statute of limitations begins to run from that date.

### a. Timeliness of the State Court Lawsuit

In Texas, a four year statute of limitations applies to a cause of action for a breach of fiduciary duty.  CIV. PRAC. & REM. CODE ANN. § 16.004(a)(5).  Winn filed her original complaint in state court on July 7, 2006.

The elements of a breach of fiduciary duty claim are: "(1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's

breach." *Lundy v. Masson*, --- S.W.3d ---, 2008 WL 1862331, *12 (Tex. App.-Houston [14 Dist.] 2008) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.-Dallas 2006, pet. denied)).

As set forth above, pursuant to Texas law, a fiduciary relationship existed between Holdaway and Winn.  This relationship was based on an informal duty; Winn was guided by Holdaway and believed Holdaway would act in her best interest.  *See Hoggett*, 971 S.W.2d at 488.  Holdaway's embezzlement of Winn's funds constitutes a breach of fiduciary duty.  It is unquestionable that Winn suffered injury resulting from Holdaway's breach.  Accordingly, the Court determines, under Texas law, there is a breach of fiduciary duty with resulting damages of at least $147,500.  Furthermore, the Court finds that this claim was timely asserted.

A two year statute of limitations applies to a claim for embezzlement.  *See* CIV. PRAC. & REM. CODE ANN. § 16.0003(a) (Vernon 2008) ("a person must bring suit for … conversion of personal property… not later than two years…");  *See Steinhagen v. Ehl*, 126 S.W.3d 623, 627 (Tex. App.—Beaumont 2004, rev. denied) (citing *Sunwest Bank of El Paso v. Basil Smith Eng'g Co.,* 939 S.W.2d 671, 674 (Tex. App.—El Paso 1996, writ denied) (*Steinhagen* citing *Sunwest* and noting that embezzlement falls under the two year statute of limitations for conversion)).  Accordingly, when the state court complaint was filed, the statute of limitations had expired on the embezzlement cause of action.

### b. The Existence of a Pre-Petition Debt

A "debt" is defined in the Code as "liability on a claim."  11 U.S.C. § 101(12).  "Claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…" 11 U.S.C. § 101(5)(A).  The cause of action for embezzlement was barred by the applicable statute of limitations; no right to payment existed, therefore, no pre-petition debt was created by the state law cause of action of embezzlement.  The breach of

fiduciary duty cause of action, however, did create a debt.[8]  That cause of action is viable under Texas law and is a right to payment not yet reduced the judgment.  Accordingly, this debt falls within the Title 11 definition of "debt."

### c. The Character of the Pre-Petition Debt.

Winn argues this debt should be nondischargeable under § 523(a)(4) because it was procured by fraud in a fiduciary capacity and by embezzlement.  As set forth above, this debt did not involve an express or technical trust; therefore, this debt does not fall within the category of debts defined as arising from "fraud …while acting in a fiduciary capacity" under § 523(a)(4).  *Miller*, 156 F.3d at 602.  Under the fraud in a fiduciary capacity theory, this debt is not excepted from discharge.

This debt does, however, arise from embezzlement.   Although the state statute of limitations expired, a state law statute of limitations is irrelevant to categorizing a "debt" for dischargeability purposes.  *See Resolution Trust Corp. v. McKendry, (In re McKendry)*, 40 F.3d 331, 332 (10th Cir. 1994).  The underlying cause creating the pre-petition debt must not be confused with the characterization of debts excepted from discharge.  *See Id.*  While this concept has not been addressed by the Fifth Circuit, courts in other circuits have held that the establishment of a debt (which may depend on a state law statute of limitations) is a proceeding separate and distinct from determining the dischargeability of the debt.

The Tenth Circuit in *McKendry* examined this issue.   *McKendry,* 40 F.3d at 332.   In *McKendry*, Plaintiff obtained a judgment against Debtor in state court, Debtor filed bankruptcy, and Plaintiff sought to have the judgment declared nondischargeable.  *Id.*  Debtor argued that "because the claim was based on fraud, a state common law cause of action, the state statute of

---

[8] Other actions alleged in the state court lawsuit may also support a viable claim which would fall within the Title 11 category of "debt."  However, because the breach of fiduciary duty claim is sufficient to support a finding that a pre-petition debt existed, the Court need not examine the other causes of action.

limitations was applicable…" *Id.* Because the statute of limitations had expired, Debtor argued the Court was barred form considering the underlying nature of the debt to determine dischargeability. *Id.* The Court first looked to the Supreme Court's decision in *Brown v. Felsen*, 442 U.S. 127 (1979) for the principle that "applying res judicata to prior state court judgments when resolving questions of dischargeability under the bankruptcy laws would serve neither the interests underlying the doctrine of res judicata nor the policies underlying the bankruptcy laws." *Id.* (citing *Brown*, 441 U.S. at 134-35). The Court, applying the reasoning of *Brown,* concluded that once a debt has been established, state statute of limitations are immaterial to § 523(a)(4). *Id.* at 337. The Court stated:

> We likewise find two distinct issues in a nondischargeability proceeding. The first, the establishment of the debt itself, is governed by the state statute of limitations-if suit is not brought within the time period allotted under state law, the debt cannot be established. However, the question of the dischargeability of the debt under the Bankruptcy Code is a distinct issue governed solely by the limitations periods established by bankruptcy law.

*Id.* The Tenth Circuit also looked to Judge Clark's decision in *Moran*.

In *Moran*, the state court Plaintiffs filed a pre-petition suit against Debtor seeking to enforce a debt, but not specifically pleading causes of action for breach of fiduciary duty or defalcation. *Spinneweber v. Moran (In re Moran)*, 152 B.R. 493 (Bankr. S.D. Ohio 1993). Once Debtor filed bankruptcy, Plaintiffs sought to have the debt declared non-dischargeable pursuant to § 523(a)(4). *Id.* Debtor argued Plaintiffs were barred by the state court statute of limitations. *Id.* The Court held "[t]he only relevant question with respect to Ohio's statute of limitations is whether the plaintiffs sought to *enforce* their *"debt"* against the debtor within the period prescribed by the statute of limitations." *Id.* at 495. Quoting *In re Taylor*, the Court emphasized that in bankruptcy court, when determining the dischargeability of a debt, there are two separate actions: "[o]ne cause of action is on the debt and the other cause of action is on the

dischargeability of that debt, a cause of action that arises solely by virtue of the Bankruptcy Code and its discharge provisions." *Id.* (quoting *Brockenbrough v. Taylor (In re Taylor),* 54 B.R. 515, 517-518 (Bankr.E.D.Va.1985)).   The Court held that, "the *nature* of the alleged debt, i.e., whether the debt is of a type determined by Congress to be nondischargeable, is to be decided by [the bankruptcy court]." *Id.*

Numerous courts have followed suit recognizing the process set forth in *McKendry*. *Lee-Brenner v. Gergely (In re Gergely)*, 110 F.3d 1448, 1453-54 (9th Cir. 1997) (finding that "the expiration of a state statute of limitations on fraud actions does not affect an action for nondischargeabiltiy if there is a valid judgment."); *Richardson v. Hidy Honda, Inc.    (In re Richardson)*, 221 B.R. 956, 960 (D. Wyo. 1998) (finding that where the state statute of limitations on embezzlement had expired, but debt was evidenced by a promissory note, Plaintiff was not barred from asserting nondischargeability under § 523(a)(4));   *Fledderman v. Glunk (In re Glunk)*, 343 B.R. 754, 761 (Bankr. E.D. Pa. 2006) (finding "[w]hether or not the Plaintiffs asserted a timely fraud claim in the underlying state litigation bears no significance in the bankruptcy court's ultimate determination of the nature of the debt and whether such debt is dischargeable pursuant to § 523(a)(2)(A)"); *Gill Distribution Ctr. v. Banks (In re Banks)*, 225 B.R. 738, 745 (Bankr. C.D. Cal. 1998) *aff'd*, 263 F.3d 862 (9th Cir. 2001) (recognizing a distinction between "an action brought under state law to enforce state-created rights and an action filed within the confines of a bankruptcy case to determine the dischargeability of a debt…"); *CBR, Inc. v. Naff (In re Naff)*, No. 96-21436-SCS, 96-2112-S, 1997 WL 1088126 at *8 (Bankr. E.D. Va. 1997) (where the statute of limitations on Plaintiff's fraud claim had expired but underlying judgment creating the debt was based in contract and not in tort, the Court held "so long as there exists, on the date the bankruptcy petition was filed, a legally enforceable claim, the time within which the creditor may seek a determination that the debt is non-

dischargeable under one of the exceptions in § 523 of the Bankruptcy Code is governed by the Bankruptcy Rules and not by any non-bankruptcy statute of limitations.").

Although this has not been directly confronted by the Fifth Circuit, the Fifth Circuit's analysis in *Deodati,* as to the non-dischargeability of debts for fraud, supports an application of *McKendry*. *Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746 (5th Cir. 2001). In *Deodati*, one of the three partners in a Mississippi accounting partnership individually defrauded a client. *Id.* at 748. The state court imposed joint and several liability of over $290,000 against the Partnership and the individual partners. *Id.* The innocent partners filed bankruptcy and the state court plaintiff sought to have this debt declared non-dischargeable pursuant to § 523(a)(2)(A). *Id.*

Section 523(a) excepts from discharge debts "for money… to the extent obtained, by— false pretenses, a false representation, or actual fraud…". 11 U.S.C. § 523(a)(2)(A). Although the innocent partners individually did not obtain money by fraud, the Fifth Circuit looked to state partnership law and found that in Mississippi, like most states, innocent partners are liable for the debt of "another partner's misappropriation of money…" *Id.* at 751 (citing *Duggins v. Guardianship of Maurice Kendall*, 632 So.2d 420, 427 (Miss. 1993)). Therefore, pursuant to the state court judgment, it was indisputable that a pre-petition debt existed for which each debtor/partner was liable.

The Court characterized this debt as arising from money obtained by fraud. It was irrelevant that the innocent partners did not participate in the fraud. The Court looked solely to the character of the debt and held the debt fell within § 523(a)(2)(A) and was therefore non-dischargeable. *Id.* at 749 (citing Lawrence Ponoroff, *Vicarious Thrills: The Case for Application of Agency Rules in Bankruptcy Dischargeability Litigation*, 70 TUL. L. REV. 2515, 2542 (1996)) ("[t]he statute focuses on the character of the debt, not the culpability of the debtor or whether

the debtor benefited from the fraud."). *Deodati,* in examining the character of the debt, is consistent with *McKendry* and its progeny. The Court, therefore, will apply the two-step process from *McKendry*. First, a debt must be established. Second, the Court will separately review the character of that debt to determine if it fits into a § 523(a) exception to discharge.

### d. The Non-Dischargeability of the Debt

As set forth above, a "debt" was established pre-petition based on the timely cause of action for breach of fiduciary duty. The Court finds that Holdaway's actions in writing the five checks from the E-Trade account, as examined above, constituted embezzlement. Holdaway's actions created a debt of $147,500.00. The character of this debt is that it arose from embezzlement. Accordingly, the Court holds a debt in the amount of $147,500.00 is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). A separate judgment will issue.

Signed at Houston, Texas, on May 12, 2008.

MARVIN ISGUR
United States Bankruptcy Judge